# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| LEAH LYNN RIO, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil No. 3:14-cv-0869 |
| NHC/OP, L.P., | ) ) ) | Judge Sharp/Brown |
| Defendant. | ) | |

## MEMORANDUM

Plaintiff Leah Lynn Rio, a former employee of Defendant NHC/OP, L.P. ("Defendant" or "NHC"), brings claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5 *et seq.* ("Title VII") and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-301 *et seq.* ("THRA"). Plaintiff alleges that Defendant discriminated against her on the basis of race and national origin. Pending before the Court is Defendant's Motion for Summary Judgment. (Docket No. 24). For the following reasons, Defendant's Motion will be granted.

## I. FACTUAL & PROCEDURAL BACKGROUND

Unless noted otherwise, the following facts are undisputed and are taken from the Parties' statements of undisputed facts. (Docket Nos. 26, 33). Plaintiff, who is Filipino, initially began working with Defendant in June 2011 at one of NHC's nursing homes. Neither Party reported any issues arising from Plaintiff's tenure at the nursing home. Plaintiff switched to NHC's HomeCare-Murfreesboro division ("HomeCare division") in March 2013, where she worked for approximately three months before giving notice and switching to a competitor company. The

1

events giving rise to this lawsuit transpired during Ms. Rio's time in the HomeCare division, where she was the only non-Caucasian physical therapist.

The HomeCare division provides physical therapy to patients in their homes and serves patients across Middle Tennessee, including patients in Rutherford, Bedford, Davidson, Wilson, and Cannon counties. When Plaintiff switched to the HomeCare division, she reported to Director of Nursing Debbie Kelley and worked with Administrator Kelley Harries. Glynnis Williams, an African-American woman, set all of the HomeCare divison physical therapists' schedules. Ms. Williams's role is to assign physical therapists to see patients in their homes as needed and recommended by their doctors. The timing of the appointments depends on the schedules of both the patient and the physical therapist, and appointments may occur on weekdays or weekends.

The Parties dispute whether the HomeCare division hired Plaintiff specifically to fill a weekend physical therapist position or whether she was hired to work full time. Regardless, both Parties acknowledge that all HomeCare division physical therapists worked some weekends and that many therapists, not just Plaintiff, expressed dissatisfaction with the schedules that Ms. Williams assigned. Plaintiff took issue with being scheduled to work most weekends and alleges that she was assigned to the patients located the farthest away.

Due to scheduling complaints, several of which came from Plaintiff, Administrator Harries scheduled a meeting with all of the physical therapists and Ms. Williams. At some point during the meeting, which took place on April 15, 2015, Administrator Harries used the phrase "black or white." Plaintiff understood this to be a comment about her, the only person in the meeting who was neither black nor white. Defendant has provided testimony that others present at the meeting understood the comment to relate to "how scheduling was done." (Docket No.

25-6 at ¶ 14; Docket No. 25-3 at ¶ 12). Upset at the perceived racial slight, Plaintiff left the meeting in tears and contacted a regional manager, Sarah Hoffman, to discuss the issue.

Defendant has presented undisputed evidence that NHC took immediate action in response to Plaintiff's complaint about the black/white comment. Ms. Hoffman reached out to Linda Bloodworth, the NHC HomeCare Regional Therapy Coordinator, to arrange for a meeting with Plaintiff. Ms. Hoffman and Ms. Bloodworth met with Plaintiff on April 18, 2013. Plaintiff recorded a portion of this meeting, which has been transcribed and included in the record. (Docket No. 25-1, Ex. 9). Plaintiff voiced a number of concerns at the April 18, 2013 meeting, many of which were unrelated to race and instead pertained to bureaucratic issues and general workplace morale. Id. at 38:9 to 39:17. At one point, Plaintiff noted that all of the HomeCare Division physical therapists "have the same frustration as me." Id. at 41:7 to 41:9. She said that it was only after the black/white comment that she began to feel like her issues with the HomeCare division related to race and confirmed that no other race-related comments were made to her. Id. at 43:19 to 43:21 and 45:8.

Defendant also scheduled a follow-up meeting for April 22, 2013, for Plaintiff to discuss her issues with Administrator Harries. Ms. Bloodworth and Ms. Hudson were again present at the meeting with Plaintiff. Plaintiff confirmed in her deposition that Administrator Harries apologized for the black/white comment at the April 22, 2013 meeting. The participants also signed a paper memorializing their discussion, including points on the protocol for missing work, treating therapists with respect, and Ms. Hoffman's availability as a resource to Plaintiff. (Docket No. 25-1, Ex. 7). The participants also planned a third meeting, to take place two weeks later, where Administrator Harries and Plaintiff would discuss progress toward the articulated goals. As planned, Plaintiff and Administrator Harries met on May 6, 2013. Administrator

Harries's notes reflect that Plaintiff said she was "good" with Administrator Harries and Ms. Kelley. When asked her plans, Plaintiff said that she was "stationary," although Plaintiff subsequently explained in her deposition that she intended this response to show she would not cave to perceived pressure to quit. (Docket No. 25-1 at 127:7 to 127:8). After the May 6, 2013 meeting it appears that the Parties proceeded without incident for a few weeks.

Plaintiff fell ill and needed to miss work at the end of May 2013. She called in sick on May 29 and 30, speaking with Ms. Kelley and Ms. Williams. Ms. Williams brought Plaintiff some work on the afternoon of May 30. At that time, Plaintiff told Ms. Williams that she was still sick and did not expect to return to work on May 31. Plaintiff did not go to work on May 31 but also failed to speak with anyone that day to officially alert them to her absence. Plaintiff's failure to call Ms. Kelley on May 31 goes against the protocol for unscheduled absences. The proper protocol was addressed by the Parties at the April 22 meeting and Plaintiff signed off on the notes confirming the requirements. (Docket No. 25-1, Ex. 7). Plaintiff also stated in her deposition that "when you call in for time off they want you to talk to the DON [Director of Nursing] or the administrator and not Glynnis [Williams] or the DON alone." (Docket No. 25-1 at 117:12 to 117:14).

Ms. Kelley, the DON, met with Plaintiff upon her return to work on Monday, June 3, 2013. At that time, she issued a written warning for Plaintiff's failure to follow policy on May 31 (the "no-call no-show disciplinary write-up"). Plaintiff has pointed out that another therapist, Cynthia Gibson, who is white, missed work on the same three days that she did. Ms. Gibson has attested to her absence on May 29-31, 2013 and has stated that although she called in on May 29, she did not call in on May 30 or May 31. (Docket No. 32). Ms. Gibson did not receive a written warning, or any other form of discipline. Id.

The following day, June 4, 2013, Plaintiff resigned, informing Defendant of her intent to leave in two weeks, on June 18, 2013. By that point, according to Defendant's undisputed testimony, Defendant had already heard of Plaintiff's plans to work for a competitor company, SunCrest, and had also heard that she was trying to recruit other therapists to leave with her. Plaintiff continued to work on June 4, but other employees reported odd behavior from her. Defendant therefore opted to end the employment relationship early, asked Plaintiff to leave immediately, and escorted her out of the building. Defendant did, however, pay Plaintiff for the entire two-week notice period.

Plaintiff filed two Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") relating to her employment with the HomeCare Division. She filed the first charge on May 3, 2013, alleging race-based discrimination. The HomeCare division received notice of Plaintiff's EEOC Charge on May 9, 2013, after which Plaintiff asserts she received "cold treatment" from Administrator Harries and Ms. Kelley. (Docket No. 25-1 at 76:17 to 76:19). Plaintiff filed the second charge on June 4, 2013, after her employment with Defendant ended. The second charge alleged retaliation. The EEOC dismissed both charges. Plaintiff filed suit in March 2014 and Defendant now seeks summary judgment on all claims.

## II.  **STANDARD OF REVIEW**

The standards governing summary judgment are well established. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52 (1986).

### III. LEGAL ANALYSIS

**A. Race & National Origin Discrimination**

Plaintiff claims that NHC discriminated against her because she is Filipino. Title VII of the Civil Rights Act of 1964 prohibits an employer from "discriminat[ing] against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[1] A Title VII plaintiff may establish such discrimination either by presenting direct evidence of discriminatory actions by the defendant or by showing the existence of circumstantial evidence that creates an inference of discrimination. Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 363 (6th Cir. 2010). Plaintiff seeks to prove her claim through the use of indirect evidence. (Docket No. 34 at 5-12).

Employment discrimination cases based upon circumstantial evidence are analyzed under the three-step burden-shifting framework articulated by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). To establish a claim of discrimination indirectly, i.e., by circumstantial evidence, a plaintiff must demonstrate (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than she. McDonnell Douglas Corp., 411 U.S. at 802. The burden only shifts to the defendant-employer if a plaintiff demonstrates a prima facie case of discrimination.

---

[1] Claims under the THRA are analyzed under the same framework as those based upon Title VII. Chattman v. Toho Tenax Am., Inc., 686 F.3d 339, 347 (6th Cir. 2012); Howington v. Quality Restaurant Concepts, LLC, 298 F. App'x. 436 n.1 (6th Cir. 2008). Accordingly, if Plaintiff's claims fail under Title VII they also fail under the THRA.

6

Id. Plaintiff satisfies the first element of her prima facie case: she is a racial minority from the Philippines and is therefore a member of a protected class within the meaning of Title VII. However, she fails to demonstrate that she suffered an adverse employment action and therefore fails to carry her burden under McDonnell Douglas.

Plaintiff attempts to categorize the following as adverse employment actions: 1) being assigned to work weekends; 2) being assigned to geographically remote patients; 3) receiving a disciplinary write-up; and 4) being constructively discharged. (Docket No. 34 at 6). The first three of these actions plainly do not qualify as adverse employment actions. "For an employment action to be materially adverse, it must significantly diminish one's material responsibilities." Bialczak v. State of Ohio Dep't of Taxation, 238 F.3d 419 (6th Cir. 2000) (citing Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996)). Indeed, "a change in employment conditions must be more disruptive than a mere inconvenience." Id.; see also Yates v. Avco Corp., 819 F.2d 630, 638 (6th Cir. 1987). Plaintiff's allegations regarding the time and location of her work assignments sound of inconvenience, not of materiality. To the contrary, Plaintiff's job responsibilities were the same as other therapists working in the HomeCare division, even if she had to perform her duties at less convenient times and locations. Similarly, without a showing of a material change in the terms of her employment, the May 31 no-call no-show disciplinary write-up also fails to qualify as a materially adverse action. Zanders v. Potter, 223 F. App'x 470 (6th Cir. 2007) (affirming the district court's conclusion "that because the letter of warning did not result in a loss of position, salary, benefits, or prestige, it could not be considered an adverse employment action of the type necessary to establish a prima facie case of discrimination.").

Neither has Plaintiff proven an adverse action via constructive discharge. To demonstrate a constructive discharge, Plaintiff must adduce evidence showing "that 1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) the employer did so with the intention of forcing the employee to quit." Logan v. Denny's, Inc., 259 F.3d 558, 568-69 (6th Cir. 2001) (citing Moore v. KUKA Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999)). Just as Plaintiff's assignments to patients at less desirable times and locations did not qualify as adverse employment actions, these assignments fail to rise to the level of intolerable working conditions necessary to sustain a constructive discharge claim. Plaintiff also testified to receiving both the cold shoulder and a question about her plan, which she interpreted to be a question about whether she intended to quit. She neither articulated what she meant by the cold shoulder nor presented any evidence on that topic. The Court therefore cannot find that this chilliness constitutes intolerable working conditions. Neither can a single question about one's plan, the meaning of which remains unclear, alone support a constructive discharge claim. Moreover, intent matters for constructive discharge claims, see Moore, 171 F.3d at 1080 (citing Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir.1982)), and Plaintiff has presented absolutely no evidence that Defendant intended to force her to resign. Rather, the record indicates that she left her position in the HomeCare division for greener pastures.

Without a showing of work conditions so intolerable that a reasonable person would feel forced to resign, Plaintiff cannot show constructive discharge. She therefore has not shown an adverse employment action, as is required to carry her burden under the McDonnell Douglas burden-shifting framework. Her race/national origin claims fail under both state and federal law and Defendant is entitled to summary judgment.

**B. Hostile Work Environment**

Plaintiff also asserts that Defendant subjected her to a hostile work environment in violation of Title VII. A work environment is actionable under Title VII if the workplace is "permeated with 'discriminatory intimidation, ridicule or insult' sufficiently severe or pervasive to alter the conditions of employment." Hawkins v. Anheuser–Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986)). A successful hostile-work-environment claim under Title VII requires a plaintiff to establish that (1) she belonged to a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on race or national origin; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the defendant knew or should have known about the harassment and failed to act. Williams v. CSX Transp. Co., 643 F.3d 502, 511 (6th Cir. 2011).

The only harassment Plaintiff alleges is the "black or white" comment by Administrator Harries during the April 15, 2013 scheduling meeting. Even assuming that this was a racially discriminatory comment targeted at Plaintiff, this single incident is a far cry from the type of severe and pervasive harassment required for a hostile work environment claim. As noted above, Plaintiff confirmed she did not receive any other comments based on race and all of the therapists had scheduling issues at one time or another. However problematic the comment by Administrator Harries was, it does not, without more, create an actionable hostile work environment. Accordingly, Defendant is also entitled to summary judgment on this claim.

**C. Retaliation**

Finally, Plaintiff claims that Defendant retaliated against her for filing the first EEOC charge. More specifically, she asserts that after Defendant received notice of the EEOC charge,

she was treated coldly and constructively discharged via the no-call no-show disciplinary write-up. To establish a prima facie case of retaliation under Title VII, an employee must show (1) that he engaged in activity protected by Title VII; (2) that his exercise of such protected activity was known by the defendant employer; (3) that the employer thereafter took an action that was materially adverse to the employee; and (4) that a causal connection existed between the protected activity and the materially adverse action. Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009).

This claim is thwarted by the same deficiency that doomed Plaintiff's race discrimination claim: she did not suffer an adverse employment action. The material terms of her employment did not change at any point: she provided in-home physical therapy to patients throughout her tenure with the HomeCare division. These terms remained unchanged notwithstanding the inconvenient patient assignments, the alleged chilly treatment Plaintiff received after her first EEOC charge, and the write-up stemming from her failure to properly report her absence. While such occurrences may have caused Plaintiff discomfort while at HomeCare, they are insufficient to constitute an adverse employment action. Accordingly, Plaintiff's retaliation claims also fails.

## IV. CONCLUSION

Plaintiff's factual showing does not make out a prima facie case of race discrimination, hostile work environment, or retaliation. Accordingly, the Court will grant Defendant's request for summary judgment.

An appropriate Order shall enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE